Good morning, Your Honors. May it please the Court, I'm Charles Nickell appearing for the petitioner. And this is a proving asylum case in which the immigration judge Excuse me, Counsel, would you introduce yourself again? Charles Nickell. Okay, the docket sheet that I have says that Helen Ziebel Oh, yes, I entered my appearance to argue. She did the briefs and I'm here to All right, well, I see there are two different docket sheets. Okay, I'll go with this one then. This one says Charles Nickell. There you are. Thank you. Thank you. This is a proving asylum case in which the immigration judge found that the petitioner was entirely credible and that he had a reasonable fear for his safety in Peru. The immigration judge denied the application for asylum because he determined that the petitioner's fear of being harmed by terrorists and narcotics traffickers arose out of his duties as a Peruvian police officer assigned to investigation of drug traffickers and terrorists. That's true, isn't it? That is correct, Your Honor. So how do you distinguish this case from Cruz-Navarro v. the INS, which held that active police officers are not members of a protected social group under the asylum laws? Yes, both Cruz-Navarro was very similar in terms of the facts to your client. The facts are similar in both Nader Fuentes and Cruz-Navarro, which upheld Fuentes. They focused on a particular social group, but they also left open the possibility that a person could, a police officer, could establish persecution on the basis of an imputed political opinion or political opinion. And so they didn't rule that out. And I don't think that Cruz-Navarro, you know, it would be expanding beyond that to say that it ruled out the possibility of political opinion. A case which I think is very much on point would be Briones v. INS. I'm sure you know, I know you're our Judge O'Scannon and I agree with you on both sides of that case. But there was a case where someone was an informant, an undercover informant like the petitioner in this case. And in that case, it was in the New People's Army in the Philippines. But like the petitioner in the present case, he worked undercover to identify and arrest terrorists. In this case, you know, members of the MPA. Like the petitioner in this case, Briones' work led to the capture of an important subversive leader, and he was threatened with harm when his identity and his undercover activities became known to the terrorists. Like the — like Briones, the petitioner in this case was motivated to engage in undercover work because of a strong political belief that the terrorist groups were undermining and tearing apart the society and the political system within this country. In that case, in Briones, the Court disagreed with the BIA's contention that the terrorist group's motivation to harm the petitioner had nothing to do with his political beliefs, but simply because he had cooperated with the military. I think that would be similar to cooperating with the — being actively involved with the police force in Peru. Roberts. Your primary contention that he fits within the, quote, social group, unquote, context or not? I don't think — I can't make that, because I don't think I'm going to borrow. Your primary contention in terms of what he qualifies for. Imputed political opinion. And what's the evidence that the Shining Path imputed some political opinion to your client? They — five years after he testified, people came out. They grabbed his wife. They said that they would find her husband no matter what it took. This happened on two occasions. He's dealing with Sendero Luminoso, which, like the New People's Army, is one of those violent terrorist groups on Earth. There's not a lot about that, but, I mean, that could have easily — simply been they were after him because he was a police officer, not because they imputed some political opinion to him. And Cruz Navarro seems to say, if they're only after you because you're a police officer, that's not good enough. Well, he also — he was the one who identified the leader. As a police officer. Right. That's correct. So I'm looking for some — something other than an inference that they imputed a political opinion to him. How's the political party involved in this, in any sense? What political party is it, and how does it operate? Well, I — the — Sendero Luminoso — the narcotics — there's much evidence in the record about the tie-in between narcotics traffickers and the terrorists, and that they work together. Now, the terrorists — Sendero Luminoso — it is a self-styled Maoist group, extremely violent. They are a political organization. They terrorized Peru for many years, and some reports say over 70,000 people were killed. It would be very much similar to the Khmer Rouge as a political organization, or the Maoists in Nepal, or the New People's Army. And, you know, there's a quote from Briones that said that his activities as an informer, which is the same as what the petitioner in this case was, who sided with the Philippine military in a conflict that was political at its core, certainly would be perceived as a political act by a group of — group informed upon. The record contains no other reason, plausible or otherwise, why the New People's Army would want to eliminate Briones other than his contribution to their defeat in the field. The New People's Army certainly was political at its core, in its essence, and they weren't a major drug trafficking operation. Sure, they engaged in some criminal activity, but the essence of the New People's Army was political. The Shining Path is a massive drug trafficking operation, and it seems to me that this police officer in this case was engaged in that part of the thing rather than the political battle with him, and it looks like the retaliation was designed to pay him back for his identification of one of their people. I don't know that there could be a clean division between the Shining Path as a — just like with the FARC in Colombia, which is a larger organization and more currently in the news, it's hard to separate the drug trafficking operation from the terrorist organization. They're both intertwined. The Shining Path depended upon the cocaine traffic for their funding, and they provided protection. So I think that — Terrorist, per se, does not translate to political, per se, does it? Well, they are a political organization. I mean, they view themselves as a Maoist organization. It's a peasant-led revolution which started in the countryside and was political with leaders. Many of their leaders are in jail. The — Abimal Guzman, the former professor who led the Shining Path, was just recently on trial again to sentencing. And they do hold political beliefs. You know, this may be a close question, but the ALJ says, and you know this, the threat to the respondent and to the family arose directly out of the prosecution of this criminal — I assume that's Osorio — for illegal drug trafficking, not necessarily because he had anything to do with the terrorists at that particular time. The respondent was threatened because he was a material witness against this individual in a criminal prosecution. That's necessarily wrong because it was the Shining Path? I think that he — that it was also a political organization. I don't think that you can neatly say that a person who was involved in drug trafficking is also dependent on Shining Path. They both are fighting against having the Peruvian government, you know, prevail. And it's certainly in the interest of the drug traffickers to have Sendero Luminoso there and being active and creating chaos, disrupting the entire social order. The Shining Path, like the New People's Army, is basically out to destroy the social fabric. And they target individuals for not paying revolutionary taxes, which are basically stick-ups. And if they would kill someone for that, they would certainly go after someone who had brought down one of their leaders. So you're down to about a minute. You may want to reserve, if you wish. Yes, I'll reserve the time I have remaining for rebuttal. Thank you. We'll hear from the government. Good morning, Your Honors. Nora Ascoli-Schwarz for Respondent Alberto Gonzalez. Nothing ever happened to this guy in Peru. He had an incident when he tried to arrest someone, but that was purely in the course of the arrest for a criminal act. He didn't even he was in the hospital. He didn't even ultimately affect the arrest. Two other officers did several weeks later. Surely Petitioner was not the only one to testify at this trial or identify him. And he doesn't talk about what happened to the other police officers who arrested him, who were also involved. He was in the hospital. And then why are they threatening him? I'm sorry? Then why are they threatening him? Well, we don't know, and he doesn't know either. This guy was out of jail for two years before somebody came up to his wife and said, we're going to find your husband. And she didn't know who they were. He assumed it was this guy. We don't know who it was. It could have been someone else. We don't know why they were threatening him. And given what we know about the Shining Path and Southern American terrorism in general, isn't it fair to assume that they were after him because he was a police officer and he was the one who fingered Osorio? Well, yes, it is fair to assume that. But, again, that's Cruz Navarro. I mean, it's pursuant to his duties. But the fact is they didn't follow up on the threats. They found his wife a month later and threatened her again. But it was interesting. The first time they said, we'll find him wherever he is. Well, they were living together at the time in the same home in the same city. They found her, but they didn't find him. Then a month later, they approach her on a bus and say, we're going to find your husband wherever he is, and if we don't find him, we're going to come after you and your children. So what does he do? Does he protect his wife and his children? No. He leaves the country. And we don't he couldn't possibly have believed that they were going to do what they intended to do and leave his family vulnerable while he leaves because they specifically said, if we can't find your husband, you and your children will face the consequences. A mere threat is not sufficient to establish past persecution or a well-founded fear of persecution. And nothing happened to his wife and children, who stayed there for, she stayed there for three months. The girls came two and a half years later, and his son came, oh, seven years later. So it sounds to me like you're arguing this is just a bogus case. Yes. But there is no negative credibility. But these, the fact that these things may have occurred means that he has a subjective fear, but there are no objective facts that they will, that anyone is looking for him in 2006. How does this case differ from the Briones case, which we now hear is the lead case, even though it's not cited in the briefs? Briones, it's a landmark case in immigration law. Sorry, repeat that. It's a what case? It's a landmark case in immigration law. I wasn't taken by surprise by it. But that guy was an informant. Here, he's a police officer. So that changes the equation. But the fact is that was his job, and he had another job as a police officer. He stayed there for four years after this guy got out of jail, and nothing ever happened to him. Nobody threatened him until a month or two before he left. I'm not quite sure why he would leave his family, who was also threatened. And you can't say that they couldn't have relocated because they stayed safely for three months, two years, and seven years. So, obviously, it is an idle threat, and, yes, it is a bogus claim, because why would anyone want to persecute him now for a conviction in 1986? He also says in his asylum application, he said that this guy was convicted for attempted murder because he had been harmed when he attempted to arrest him. This guy being Osorio? Right. But two problems with that. One is the conviction document that his friend obtained for him said he was not convicted of murder, just of trafficking. And, two, he says in his own at page 113, he said, I no longer fear any individual. I just fear everyone in Peru. He fears the police because he handed in his resignation notice. First of all, as the immigration judge noticed, he complained he didn't like some of the overzealous actions of some of his colleagues, and he mentioned a few things, but he didn't report it officially, and nothing ever happened to him during all the years, even though he started complaining about it in 1983. He didn't formally complain. Nothing happened to him when he exchanged some views with friends who were like-minded. But then he said he resigned from the police force and didn't wait until his resignation was processed because it takes years to process a resignation, and then he calls his friend who's a police officer for 27 years, and he asks him, oh, find out, you know, get me the conviction documents. But does he ask him, by the way, can you check on my resignation process? And then he said, well, I got people, the police were writing to me at home. Doesn't say what they were writing to him about. They might as well have been saying, we accept your resignation. Where shall we send your pension check? Or you haven't shown up for work in two years. Where are you? We're worried about you. But he doesn't say what the contents of the letters were, so it's just as likely that they accepted his resignation as that they were out to get him. Do you think they were writing to him to say, oh, you resigned, you didn't wait until your resignation was accepted, we're going to come and get you? But the point is, it doesn't, the evidence does not compel the finding that the police are after him for any reason, for desertion or for political opinion, and we're not sure who's looking for him or who was looking for him or who accosted his wife twice in 1990, but there's nothing to indicate that anyone would have any interest in him in 2006. And again, I really have a problem with someone whose wife and children are threatened if they can't find him, and then he skips the country and leaves them to fend with the terrorist threats. A new doctrine, cowards don't qualify. No, it just means that he didn't take the threat seriously, because if he did, he would, I mean, if the threat was serious, then his wife and children were at risk. If he actually believed the threat, would he have left them at risk? Plus the fact, we don't really know who he is. I mean, why did he have to buy a fake passport? Why did his wife have to have a fake passport? Why three years later did his daughters have to have fake passports? Why seven years later did his son have to have a fake passport? Why couldn't he just apply? He gives absolutely no reason for that. Well, but the agency never determined that he wasn't who he claimed to be. No, no, absolutely not. But we don't know why he couldn't apply for a regular passport. Why did he have to buy passports at $6,000 a pop? Could that be an inference the other way? Could that be an inference in favor of his position? It could be in favor. It could be against. There's nothing to establish it either way. It's his burden of proof to say, I could, I had to buy a passport. We don't know why he and every member of his family over seven years in which they trickled into the United States had to buy passports. But basically he faced nothing. You know, he was an undercover policeman for nine years. Any claim he has, which, and I don't think he has any. I don't think the record compels the finding that he has any, would be governed by Cruz-Navarro. But certainly nothing persecutory ever happened to him. He got two unfulfilled threats in 1990, and there's nothing to indicate that anyone's looking for him in 2006. In fact, he said the strangers stopped visiting his house in 1996, and the letters stopped coming after two years. So there's no continuing interest. There's no well-founded fear of persecution. There's no basis for a grant of asylum. The evidence does not compel otherwise. Any more questions, Your Honor? Roberts. Thank you, counsel. Thank you. Mr. Nickel, you have about a minute. Yes. I would first of all note that when his wife was first grabbed and threatened, he did move his family. I'm looking at the immigration judge's decision, AR-51, that about the time he moved his family to Callejo to live with the male Petitioner's in-laws. It was after he was, she was again approached and threatened there that they managed to relocate them that he fled to the United States. He is the one who fears persecution. It's my understanding from this record, and I saw nothing to the contrary, that the individuals were only searching for him. They said it doesn't matter where he hides, we're going to find him. His presence there would actually present perhaps more of a danger to his family than if he were to leave because the persons were seeking him out, not members of his family who are applying his derivatives. His wife did not submit an independent claim claiming persecution. Her fear of persecution is that if I'm with him, you know, he stands a chance of being killed, and having him there with me would present a danger. I think that this is a matter which Briones would certainly, it's on point with that. Roberts. All right. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: Beezer, O'scannlain, Trott